## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## EL PASO DIVISION

| | | |
|---|---|---|
| TREY MARTINEZ FISCHER, Texas State Representative (HD 116), | § § § | |
| *Plaintiff,* | § § | |
| v. | § § | CIVIL ACTION NO. 3:21-CV-306 |
| GREG ABBOTT, in his official capacity as Governor of the State of Texas; JOHN SCOTT, in his official capacity as Secretary of the State of Texas, | § § § § § | |
| *Defendants.* | § § | |

PLAINTIFF'S ORIGINAL COMPLAINT

### I. Introduction

1. In 1968, San Antonio celebrated its 250th birthday on the global stage with the World's Fair. Among the many local leaders who contributed to the success of HemisFair '68 was the late U.S. Rep. Henry B. González, who represented downtown San Antonio. Today, that park is no longer represented by a San Antonian. Like many other downtown assets, it has been drawn into a congressional district anchored in Austin.

2. On October 25, 2021, Governor Abbott signed SB 6 into law, which apportioned Texas 38 congressional districts in relation to U.S. Census. CD 35 was created 10 years ago as a result of rapid population growth in central Texas. It grew into a majority Hispanic Citizen Voting Age Population (HCVAP) congressional district. According to the Texas Legislative Council, CD 35

in the benchmark map was a 52.6% HCVAP majority. Under SB 6, CD 35 is no longer a majority HCVAP district. SB 6 dilutes the voting strength of Latino voters in central Texas.

3.   Worse yet, SB 6 harms San Antonio, specifically. Under the maps created by SB 6, San Antonio's central business district, downtown university, the River Walk, and the John H. Wood Jr. U.S. courthouse have been drawn into a congressional district anchored by a majority of its population in Austin. The Alamo, a famed historical landmark and one of the most popular tourist attractions in the State, has been drawn into a district anchored in Laredo. These dangerous divisions of San Antonio ensure that the largest Latino majority city in the United States will not have its full voice in the United States House of Representatives.

4.   SB 6 must be enjoined.

**II.  Jurisdiction & Venue**

5.   Jurisdiction is based upon 28 U.S.C. § 1343(3) & (4) and upon 28 U.S.C. § 1331 for causes of action arising from 52 U.S.C. §§ 10301 and 10304. Jurisdiction for Plaintiff's claim for declaratory relief is based upon 28 U.S.C. §§ 2201 and 2202. Jurisdiction for Plaintiff's claims under the Fourteenth Amendment to the U.S. Constitution is based upon 42 U.S.C. § 1983 and 28 U.S.C. § 1331. Jurisdiction for Plaintiff's claim for costs and attorney's fees is based upon 42 U.S.C. § 1988 and 52 U.S.C. § 10310(e). Venue is proper in this Court under 28 U.S.C. 1391(b)(2) because a substantial part of the events and omissions giving rise to the claims in this case occurred in the Western District of Texas. Plaintiff requests a three-judge panel pursuant to 28 U.S.C. § 2284.

**III. Parties**

6.   Plaintiff Trey Martinez Fischer is the current Texas State Representative for House District 116 (HD 116). He is a registered voter in HD 116 and CD 35 and will vote in future state and

federal elections, including the swiftly approaching 2022 Democratic primary election. He is injured by SB 6, because of the intentionally discriminatory choice to dilute the strength of Latino voters in CD 35. He is Latino. He may be served by and through his counsel in this matter.

7.   Defendant GREGORY W. ("Greg") ABBOTT is the Governor of Texas and, pursuant to Article IV, Section I of the Texas Constitution, is the chief executive officer of the State of Texas. He is sued in his official capacity.

8.   Defendant John Scott is the Secretary of State of Texas. He is the chief election officer of the State of Texas and is currently responsible for administering and implementing the election laws in Texas, including SB 6. He is sued in his official capacity.

**IV. Facts**

9.   Trey Martinez Fischer is the current Texas State Representative for HD 116. He is the former Chairman of the Mexican American Legislative Caucus (MALC) and the Texas House Committee on Business & Industry. He has served 10 terms in the Texas House. He has been named one of the Ten Best Legislators in the Texas House according to Texas Monthly on multiple occasions. He is a U.S. Citizen. He resides and is registered to vote in CD 35 and will vote in future elections.

10. As a result of the pandemic, the U.S. Census Bureau provided redistricting data as "legacy format summary files" for all states on August 12, 2021. Then, on September 16, 2021, the U.S. Census Bureau released the 2020 Census Redistricting Data (Public Law 94-171) Summary Files and the full redistricting data toolkit.

11. In response to the publication of the Census, Governor Abbott issued a proclamation ordering the third called special session of the 87th Legislative Session to consider the apportionment of Texas' congressional districts.

12. SB 6, a bill relating to the composition of the districts for the election of members of the United States House of Representatives from the State of Texas, was filed on September 27, 2021. It was passed by both chambers of the legislature on October 18, 2021. SB 6 was signed into law on October 25, 2021. It becomes effective on January 18, 2022.

13. In the benchmark map, PLAN C 2100, CD 35 is a central Texas congressional district that spans from downtown San Antonio north to Austin. It took in parts of Bexar, Comal, Guadalupe, Caldwell, Hays, and Travis Counties. By the end of the decade, CD 35 was 52.6% Hispanic Citizen Voting Age District. According to the Texas Legislative Council, CD 35 in the benchmark had 344,030 in population in Bexar County and 263,480 population in Travis County.

**CD 35 in PLAN C 2100 (Benchmark)**



14. In SB 6, CD 35 has radically shifted its population to Travis County. In SB 6, there are more than 40,000 fewer Bexar County voters in CD 35. The number of Travis County voters has been increased by 37,000 voters. As a consequence, CD 35's Spanish Surname Vote Registration has decreased by 6% points.

**CD 35 in PLAN C 2193 (SB 6)**



15. CD 35 in SB 6 is no longer a Latino opportunity district.

16. There has been rampant population growth in Texas, specifically central Texas. In the last decade, Travis County increased its population by 265,922 people. Bexar increased its population by 294,551.

17. Over the same period, Hays County become one of the fastest growing counties in the Nation.

18. Since 2010, Texas has increased its population by 3,999,944 people. Fully, 95% of that growth was non-Anglo and 49.5% of that growth was Latino.

19. Despite this growth, SB 6 has no new Latino opportunity districts.

20. The failure to create new Hispanic opportunity districts and the elimination of an emerging Latino majority district like CD 35 was motivated by intentional, racial discrimination.

21. It is possible to create more Hispanic majority congressional districts. In fact, several ameliorative amendments that would have provided more Hispanic opportunity were rejected by both chambers of the Texas Legislature.

22. This failure to consider or accept ameliorative amendments that would enhance minority opportunity is strong evidence of intentional discrimination or an otherwise impermissible motive.

23. Elections in CD 35 are racially polarized.

24. In fact, elections in Texas are racially polarized.

25. Latinos are politically cohesive in CD 35 and vote as a bloc for the Latino-preferred candidate.

26.  In Texas and in CD 35, Anglos (White Non-Hispanics) vote sufficiently as a bloc to enable them, in the absence of special circumstances (e.g. single-member districts), to defeat the minority voters' preferred candidates of choice. In CD 35 and throughout Texas as a whole, Anglos vote as a politically cohesive bloc against minority-preferred candidates.

27. Texas has a despicable and regrettable history of racism. Congressional elections and the creation of congressional districts have also had a troubling history of segregation and racial conflict.

28. Throughout Texas, federal courts have found that the elections in Texas bear the taint of racial polarization. "Regardless of methodology …experts [have] found that general election and primary election voting in Texas is highly polarized along racial-ethnic lines." *Perez, et al v. Abbott, et al.,* No. 5:11-cv-00360-OLG-JES-XR at ¶ 690 (W.D. Texas March 10, 2017) (Fact Findings General and Plan  C185).

29. In the past decade, the State of Texas has instituted several barriers to minority participation that enhance minority vote dilution.

30. In 2011, Texas enacted one of the most stringent voter qualification laws of the United States. Voter ID was the law of the land until enjoined because of violations of Section 2 of the Voting Rights Act and the 14th Amendment. Initially, Texas was found to have intentionally racially discriminated against minority voters by enacting and in the enforcement of its Voter ID law.

31. Also in 2011, Texas enacted several redistricting plans many of which violated the 14th Amendment and Section 2 of the Voting Rights Act. In addition, in the adoption of those plans, a three-judge panel found that Texas had intentionally discriminated against minority voters.

32. In the recent past, Texas instituted a voter purge of its voting rolls supposedly targeting non-citizen voters. However, Texas was enjoined before enacting its purge because Texas had in actuality haphazardly removed more citizens than non-citizens. Texas settled these claims before a court could make a determination of Texas' intent in these matters.

33. In the last 90 days, Texas has enacted yet another voter disfranchisement bill, SB 1, which is currently being challenged in federal court.

34. In Texas, there is a strong and consistent correlation between socio-economic welfare and race, such that Latinos and African Americans are more likely to be economically disadvantaged than their Anglo peers.

35. Anglos have a mean per capita income of $45,278, which is almost three times the $14,511 mean per capita income for Latinos. Moreover, median income for Anglo households is more than twice that of Latino households, with median income of Anglos totaling $75,124, compared to the $38,916 median household income of Latinos.

36. The American Community Survey (ACS), a data project of the U.S. Census Bureau, indicates that Latinos have a higher incidence of poverty than do Anglos. According to the ACS, 9.2% of Anglos earn less than 150% below the poverty level, but 34.5% of Latinos earn less than 150% of the poverty level.

37. Latinos in Texas are substantially more likely to have received less education than Anglos: the ACS indicated that 28.3% of Latinos over the age of 25 had completed nine or fewer years of education, whereas only 1.8% of Anglos over the age of 25 had completed nine or fewer years.

38. There is a strong correlation between the inability to elect minority-preferred candidates and the socio-economic disparities experienced by Texas minorities.

39. Texas elections are typified by subtle and overt racial appeals.

40. In Texas, Latino-preferred candidates for state office are rarely, if ever, successful

41. There is no policy rationale that would justify the dilution of Latino voting strength in CD 35.

42. The policy choice to decrease CD 35 as a Latino opportunity district will have a disparate impact on the Latino community in central Texas generally, and in CD 35 specifically.

43. The adoption of SB 6 was fueled by a discriminatory purpose.

44. The sequence of events leading up to the adoption of SB 6 was fueled by a racially discriminatory purpose, including deviations from normal procedure, lack of transparency and public input, and a rushed, inconsistent process leading to enactment.

**V.  Causes of Action**

**Count 1 – Section 2 of the Voting Rights Act**

45. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

46. The adoption of SB 6 is an election change that results in a denial or abridgement of the right to vote of the plaintiff on account of his race, color, or ethnicity, by having the effect of canceling out or minimizing his individual voting strength as a minority in Texas. This election change does not afford the plaintiff and other Latino voters in central Texas an equal opportunity to participate in the political process and to elect representatives of their choice, and denies individual plaintiffs and organizational plaintiff's members the right to vote in elections without distinction of race, color or previous condition of servitude in violation of 52 U.S.C. § 10301 *et seq*.

**Count 2- Equal Protection Clause of the 14th Amendment to the US. Constitution**

47.  Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

48.  The choice by the State of Texas in adopting SB 6 is an election change that disfranchises minority voters and discriminate against plaintiffs on the basis race and national origin in violation of 14th Amendment to the U.S. Constitution.

9

## VI. Request for Injunctive Relief

49. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

50. Plaintiff will likely succeed on the merits, because SB 6 dilutes the votes of minority voters in CD 35 and violates federal and state law. The policy choice of the State of Texas to racially gerrymander CD 35 and to dilute the Latino majority in CD 35 in the benchmark is an election change that nullifies the electoral voice of the minority voters of CD 35, including the plaintiff.

51. Plaintiff will suffer immediate and irreparable injury.

52. There is no harm to the State of Texas or the defendants from being prevented from administering election districts that violate federal law and the U.S. Constitution.

53. The injunction is in the public interest, because the right to cast a meaningful vote is the foundation upon which all other rights and freedoms are based.

54. Plaintiff has no other adequate, plain, or complete remedy at all other than enjoining the SB 6.

55. Plaintiff requests that the Court enter a permanent injunction prohibiting Defendants implementing any future elections held pursuant to SB 6.

## VII.        Conclusion and Requests for Relief

62. For the foregoing reasons, Plaintiff respectfully requests that Defendants be cited to appear and answer and that the Court take the following actions and grant the following relief:

A. Appropriate preliminary and permanent injunctive relief to which it shows itself entitled;

B. Entry of a declaratory judgment as described above;

C. Attorneys' fees and court costs; and,

D. Any other or further relief, in law or equity that the Court determines that plaintiffs are entitled to receive.

**DATED**: December 13, 2021                    Respectfully,

                                                By: /s/ *Martin Golando*

                                                The Law Office of Martin Golando, PLLC
                                                Texas Bar No. 24059153
                                                2326 W. Magnolia Ave.
                                                San Antonio, Texas 78201
                                                Office: (210) 471-1185
                                                Fax: (210) 405-6772
                                                Email: martin.golando@gmail.com

                                                Attorney for Plaintiff